## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

**THE BRADY CENTER TO PREVENT GUN VIOLENCE**

840 First Street, NE, Suite 400
Washington, DC 20002

*Plaintiff*,

v.

**FEDERAL BUREAU OF INVESTIGATION**

935 Pennsylvania Avenue, NW
Washington, DC 20535

*Defendant*.

Civil Action No. __

**Complaint for Declaratory Judgment and Injunctive Relief**

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1.   This is an action for declaratory relief, the production of records, and injunctive relief pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended.

2.   On October 29, 2019, Brady Center to Prevent Gun Violence ("Brady" and "Plaintiff") submitted a FOIA request to the Federal Bureau of Investigation ("FBI" or "Bureau") to discover fundamental information about how the Government implements the core gun violence prevention law that Brady fought to make law: the Brady Law, that requires that Brady background checks be conducted before any gun sales by licensed dealers, to determine whether the buyer is legally permitted to possess a gun.  Specifically, Brady requested records related to the National Instant Criminal Background Check System ("NICS") standard operating procedures ("SOPs") (collectively, the "NICS SOPs Request").

3.   To date, more than a year after the submission of the NICS SOPs Request, the FBI has neither issued a determination regarding the FOIA Request nor released a single page or record in response. In fact, a letter categorizing the NICS SOPs Request as a "medium track" request for which the FBI will require up to *29 months* to reach a determination regarding what can be produced constitutes the extent of the FBI's response to the FOIA Request to date. This timeline far exceeds FOIA's statutory deadline to make a "determination" within 20 working days of the receipt of the request and to "promptly" produce records following such determination.

4.   On July 22, 2020, Brady submitted a second FOIA request to the FBI to seek information about the legality and propriety of gun sales during the recent buying surge by requesting records relating to staffing and processing times during the "COVID-19" pandemic (the "COVID-19 Request"). To date, over 5 months since the submission of the COVID-19 Request, the FBI also has neither issued a determination regarding the COVID-19 Request nor released a single page or record in response. Indeed, Brady has not even received a letter from the FBI categorizing the COVID-19 Request as a small, medium, large, or extra-large track request. The FBI's response to the COVID-19 Request has also exceeded the statutory deadline to comply.

5.   The FBI provided no notice of "unusual circumstances" that warrant an extension for the collection, examination, and consultation about the responsive documents. In any event, the FBI's timeline far exceeds the 10-working day extension permitted under FOIA as well.

6.   This case seeks declaratory relief that the FBI is in violation of FOIA for failing to respond to the NICS SOPs Request and COVID-19 Request (collectively, the "FOIA Requests") within the statutory timeframe, and injunctive relief that the FBI be ordered to

immediately and fully respond to the FOIA Requests in compliance with the FBI's statutory

obligations under FOIA.

## PARTIES

7.   Plaintiff, Brady, is a 501(c)(3) non-profit corporation incorporated under the laws

of the District of Columbia, and headquartered at 840 First Street NE, Suite 400, Washington,

DC 20002.

8.   Defendant, the FBI, is a component of the U.S. Department of Justice, which is a

department of the executive branch of the United States Government and is an agency within the

meaning of 5 U.S.C. § 552(f) and 5 U.S.C. § 551(1). Upon information and belief, the FBI has

possession, custody, and control of the documents that Plaintiff seeks in response to its FOIA

Requests.

## JURISDICTION AND VENUE

9.   This Court has both subject-matter jurisdiction over this action and personal

jurisdiction of the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction

over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Venue lies in this

district under 5 U.S.C. § 552(a)(4)(B).

10. Defendant FBI is an agency within the meaning of 5 U.S.C. § 552(f). Upon

information and belief, the FBI has possession and control of the requested records and is

responsible for fulfilling Plaintiff's FOIA Requests.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

11. FOIA, 5 U.S.C. § 552, requires federal agencies to release requested records to the public unless one or more specific statutory exemptions applies.

12.  Upon a request for records, FOIA requires the agency to make a determination on a FOIA request, stating whether it will comply with the request within 20 working days. 5 U.S.C. § 552(a)(6)(A)(i). If unusual circumstances apply, an agency may request, by written notice, an additional 10 working days to issue its determination. 5 U.S.C. § 552(a)(6)(B)(i).

13. FOIA requires each agency (1) to conduct a search reasonably calculated to uncover all responsive documents; and (2) to promptly make available such responsive records. 5 U.S.C. § 552(a)(3)(A), (C).

14. If an agency fails to comply with the time periods set forth in the statute, then the requester is "deemed to have exhausted his administrative remedies," and may seek judicial review. 5 U.S.C. § 552(a)(6)(C)(i); (E)(iii).

15. This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

### FACTS UNDERLYING PLAINTIFF'S CLAIM FOR RELIEF

16. The Brady Center to Prevent Gun Violence is an independent, nonpartisan, non-profit organization with a mission to create a safer America by dramatically reducing gun-related injuries and deaths. For more than 45 years, Brady  has taken on the corporate gun lobby and worked in and out of the courts to obtain justice for victims of gun violence, to reform dangerous industry practices, and to lead a new national conversation about gun violence prevention.

17. Brady and its sister organization the Brady Campaign to Prevent Gun Violence focus on education, litigation, and legislation and use a combination of research, litigation, and advocacy to achieve its mission of creating a safer America. As part of its activities, Brady uses government records made available to it under FOIA, which it disseminates to the public. Brady publishes comprehensive reports based on records obtained via its FOIA requests, which in turn often generate substantial media coverage. For instance, a Brady Center FOIA request uncovered that gun lobbyists helped author an ATF white paper on how the Trump Administration planned to reduce regulations on assault weapons, silencers, and gun dealers.[1]

18. Brady has invested considerable resources in encouraging the government and all Americans to study and address the national epidemic of gun violence. Brady closely monitors the laws, rules, and practices applicable to government agencies in order to fulfill Brady's mission of educating the public and ending the epidemic of gun violence. An important part of achieving Brady's mission of reducing gun deaths and injuries is holding the FBI accountable for its role in properly and effectively checking records on persons who may be disqualified from receiving firearms through the NICS.

19. In 1993, the Brady Handgun Violence Prevention Act ("Brady Act") was signed into law[2], following a seven year perseverant effort by James and Sarah Brady—for whom Brady and its sister organization are each named after.[3]  The Brady Act instituted national procedures for federally licensed firearms dealers to verify whether potential customers were prohibited from purchasing firearms.  One of the new procedures that the Brady Act instituted was the

---

[1] Brady Center to Prevent Gun Violence, *Brady Center FOIA Litigation Forces Release of Secret ATF Documents Regarding Gun Lobby Influence of Federal Gun Policy* (Feb. 13, 2018), *available at* https://www.bradyunited.org/press-releases/brady-center-foia-litigation-forces-release-of-secret-atf-documents-regarding-gun-lobby-influence-of-federal-gun-policy.
[2] *See* Pub. L. No. 103-59, 107 Stat. 1536 (1993).
[3] Brady Center to Prevent Gun Violence, *History of Brady*, *available at* https://www.bradyunited.org/history.

creation of "a national instant criminal background check system" that would contain "information . . . on whether receipt of a firearm by a prospective transferee" would be illegal.[4] Licensed importers, manufacturers, and dealers of firearms are required to "contact[] the national instant criminal background check system" before transferring any firearm to a person that is not otherwise licensed to possess a firearm.[5]

20. The Attorney General of the United States is responsible for creating and overseeing the NICS.  In particular, the Brady Act directed the Attorney General to "establish" the NICS within five years of enactment and to "expedite" certain tasks related to the NICS, including "the upgrading and indexing of State criminal history records in the Federal criminal records system maintained by the Federal Bureau of Investigation," and "the development of hardware and software systems to link State criminal history check systems into the [NICS]."[6]

21. The Brady Act further authorized the Attorney General to "secure directly from any department or agency of the United States such information" about persons prohibited from possessing firearms "as is necessary to enable the [NICS] to operate."[7]  The FBI activated the NICS in November 1998, and the NICS has been in virtually continuous operation since then.

22. The NICS is an information system housed at the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia.  When a firearms dealer contacts the NICS to run a background check of a prospective firearms buyer, the name check is assigned to a NICS Examiner and subsequently queried to three national databases maintained by the

---

[4] *Id*. § 103(b) (codified at 18 U.S.C. § 922 note).
[5] 18 U.S.C. § 922(t)(1)(A).
[6] Brady Act § 103(a) (codified at 18 U.S.C. § 922 note).
[7] *Id*.

FBI—the Interstate Identification Index, the National Criminal Information Center, and the NICS Indices.[8]

23. After querying these databases, the NICS system provides one of three responses: (1) "Proceed" if no disqualifying information is found; (2) "Denied" when at least one matching record is found that demonstrates that the prospective transferee is prohibited from receiving a firearm; or (3) "Delay" when "the NICS search finds a record that requires more research by a NICS Examiner  to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law."[9]

24. A "Delay" response requires additional review by a NICS Examiner, and the firearms dealer must wait three business days or until a "Proceed" response is given, whichever comes first, to complete the transaction.[10] If the NICS Examiner fails to provide a response within three business days, the background check is designated as "Delayed." Under current federal law, a firearms dealer may legally proceed with a sale to an individual with a "Delayed" status, even though that prospective purchaser may later be determined to have been a prohibited purchaser after the sale is complete. In 2015, the FBI's failure to promptly follow up on a "Delayed" response is exactly what allowed a prohibited purchaser to purchase a .45-caliber handgun, which he later used to kill nine people in a church in Charleston, South Carolina. By law, the perpetrator was prohibited from purchasing a firearm because of a previous arrest for illegal possession of a controlled substance, a misdemeanor. However, because his arrest record was not accurately detected within this three-day window, the sale was allowed to proceed by

---

[8] In most States, background check requests are sent directly to the FBI.  Some States, however, act as a "Point of Contact" or "POC" intermediary between the requesting firearms dealer and the NICS.  *See*, *e.g.*, 28 C.F.R. § 25.6(d).
[9] 28 C.F.R. § 25.6(c)(1)(iv).
[10] *Id.* § 25.6(c)(1)(iv)(B); *see also* 18 U.S.C. § 922(t)(1)(B).

default.[11] Following this mass shooting, the sale of a firearm through a "default proceed" became better known as the "Charleston loophole."[12]

25. In a civil suit brought by the victims of the Charleston mass shooting against the United States, Judge Richard Gergel criticized the FBI for making a series of "abysmally poor" choices that resulted in "glaring weaknesses" in the NICS background check system.[13] During the course of the civil proceedings, the FBI produced the entire set of SOPs within just *one week*.[14]

26. Having been one of the few people outside of the FBI to review the complete set of NICS SOPs, Judge Gergel opines in *Sanders* that the "NICS 'one and done' approach to the request of information is not defensible", and that the NICS SOPs were "hopelessly stuck in 1995."

27. Given Judge Gergel's scathing review of the FBI, NICS, and the NICS SOPs, Brady committed to use its resources to engage the FOIA process to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal citations omitted).

28. Brady plans to analyze the information it receives in response to its FOIA Requests, identify any deficient background check procedures, and make proposals regarding improvements that can be made to the NICS SOPs and background check process. Accordingly,

---

[11] The failure to retrieve the full details about Roof's arrest record boiled down to the lack of follow up by a NICS Examiner following a failed fax to the appropriate law enforcement agencies. As Judge Gergel explains in *Sanders*, the failure of the NICS Examiner to follow up about Roof's record was "hardly surprising, because, as revealed in the jurisdictional discovery, the NICS practice was to make a single fax inquiry to a law enforcement agency and attempt no further follow up of any type." *Sanders v. United States*, 324 F. Supp. 3d at 646.

[12] *How COVID-19 Has Made a Federal Background Check Loophole Even* Deadlier, EVERYTOWN FOR GUN SAFETY SUPPORT FUND (Apr. 13, 2020), *available at* https://everytownresearch.org/report/covid-default-proceed/.

[13] *Sanders v. United States*, 324 F. Supp. 3d 636 (D.S.C. 2018).

[14] *Id.* (On February 7, the court ordered the government to produce "all NICS SOPs in effect in April 2015 for *in camera* review. *See* ECF No. 52. On February 15, 2018, the government produced a "complete, unredacted set" of the SOPs. *See* ECF No. 53.).

production of this information will help to optimize the enforcement of existing gun violence prevention laws.

29. Brady is harmed by the FBI's failure to comply with FOIA because that failure harms Brady's ability to provide full, accurate, and current information to the public on a matter of widespread public interest. 5 U.S.C. § 552(a)(6)(c). Absent this critical information, Brady cannot advance its mission of ending America's gun violence epidemic.

30. As further alleged below, the requested information will be used to advance these goals and to educate the public.

**FOIA Request No. 1451131-000 NICS Standard Operating Procedures**

31. On October 29, 2019, Brady submitted the NICS SOPs Request, seeking complete, unredacted copies of the NICS SOPs, and seeking three categories of requested records:

1. All complete or partial tables of contents or indexes that depict, organize, or display any SOPs relating to NICS in effect as of October 2019 ("Category 1 Request: Scope");

2. A full and complete (i.e., unredacted) copy of each and every current SOP relating to NICS, including any cover page, attachments, and/or exhibits thereto in effect as of October 2019 ("Category 2 Request: Current SOPs");

3. A full and complete (i.e., unredacted) copy of each and every historical SOP relating to NICS (including those that have been revised and/or are no longer in effect) dating back to January 1,

2011, including any cover page, attachments, and/or exhibits thereto

("Category 3 Request: Historical SOPs");

32. The NICS SOPs Request also requested a fee waiver.

33. A true and correct copy of the NICS SOPs Request is attached as <u>Exhibit A</u>.

34. On November 5, 2019, Brady received a confirmation letter via email acknowledging the request and assigning the request as FOIA Request No. 1451131-000 NICS Standard Operating Procedures.

35. On January 28, 2020, after three months without a substantive response or fee waiver determination from the FBI, Brady contacted the FBI seeking a status update. The FBI responded the same day, indicating that it had not yet categorized Brady's request but providing an estimated completion date of 1,591 days, or approximately 52 months.

36. In January of 2020 alone, the total number of federal NICS transactions (background checks) was approximately 721,803, representing over a 23% increase from the year prior. [15] Of those transactions, the FBI's failure to respond ("Delayed" response) resulted in approximately 20,759 of firearms sales to proceed through the Charleston loophole representing over an 11% increase from the year prior. [16]

37. On March 9, 2020, Brady sent a follow-up letter to the FBI's Public Information Office, Information Management Division, requesting a response by March 31, 2020. The FBI did not respond.

---

[15] Betsy Woodruff Swan, *Blocked Gun Sales Skyrocket Amid Coronavirus Pandemic*, POLITICO (July 23, 2020), *available at* https://www.politico.com/news/2020/07/23/blocked-gun-sales-skyrocket-amid-coronavirus-pandemic-379452.
[16] *Id.*

38. On March 20, 2020, and again on March 26, 2020, Brady left voicemail messages with the FOIA Public Information Officer. In both cases, the FOIA Public Information Officer did not respond.

39. In March 2020 alone, the total number of federal NICS transactions was approximately 1,462,536, representing over a *77% increase from the year prior.*[17] Of those transactions, the FBI's failure to respond resulted in approximately 76,558 of firearms sales to proceed through the Charleston loophole, representing over a *172% increase from the year prior.*[18]

40. Between March 2020 and July 2020, 5.86 million background checks were conducted, representing over a staggering *93% increase from the year prior.*  Of those transactions, the FBI's failure to respond resulted in approximately 5% (or 294,683) of firearms sales to proceed through the Charleston loophole.[19]

41. On April 6, 2020, Brady left a voicemail with the FOIA Public Liaison Officer. The FOIA Public Liaison Officer did not respond.

42. In May 2020, in response to the surge of gun purchases, the Department of Justice requested additional funding from Congress, in part to support more staff to conduct background checks.[20] Gun violence has been on the rise recently. "In May, the Gun Violence Archive reported the country's highest number of mass shootings of any month since the group began tracking this data in 2013. According to a Wall Street Journal analysis, 36 of the U.S.'s 50

---

[17] *Id.*
[18] *Id.*
[19] Jemima McEvoy, *Nearly 300,000 Americans May Have Bought Guns Without Background Checks Amid Pandemic*, FORBES (Sept. 15, 2020), *available at* https://www.forbes.com/sites/jemimamcevoy/2020/09/15/nearly-300000-americans-may-have-bought-guns-without-background-checks-amid-pandemic/#4dc23de42b99.
[20] *Id.*

biggest cities have seen double-digit increases in homicides, resulting in 24% more homicides so far this year."[21]

43. Between June 2020 and November 2020, Brady Center engaged in multiple communications with the FBI regarding the status of its FOIA Requests (a true and correct copy of which is attached as <u>Exhibit B</u>) in an effort to secure a quicker response to its FOIA Requests and thereby avoid litigation. However, these efforts were unsuccessful.

44. Over two months later, on June 25, 2020, Brady received an email from the FOIA Negotiation Team (<u>Exhibit B</u> at 18-19), indicating that the agency had identified a single document of approximately 120 pages responsive to the NICS SOPs Request and forecasting a completion date of 29 months (equivalent to approximately 4 pages per month), based on the following criteria:

> "We now estimate that small track requests (50 pages or fewer) will require approximately 8 months to complete; medium track requests (51 - 950 pages) will require approximately 29 months to complete; large track requests (951-8,000 pages) will require approximately 56 months to complete, and extra-large requests (over 8,000 pages) will require approximately 70 months to complete. Please note that these are estimates and these timelines may change as the national emergency evolves. The FBI remains committed to fulfilling your FOIA request in the timeliest manner possible. Thank you for your patience and understanding."

---

[21] *Id.*

45. On July 1, 2020, the FOIA Negotiation Team contacted Brady asking to "follow up." (Exhibit B at 18.) The same day, Brady responded, acknowledging receipt to what it assumed at the time was an automated message.

46. On July 6, 2020, the FOIA Negotiation Team again contacted Brady asking to "follow up." (*Id.*) The same day, Brady responded, indicating that the processing time is disappointing and contrary to FOIA's requirements. Brady also sought contact with the FOIA Negotiation Team. (*Id.* at 17.) The same day, Brady and the Negotiation Team exchanged a series of emails to schedule a telephone call for July 8, 2020. (*Id.* at 12-17.)

47. On July 8, 2020, Brady and a representative from the Negotiation Team discussed the FOIA review process, expedited requests, and what it would mean to possibly narrow the request ("July 8 Call").

48. On the July 8 Call, the representative acknowledged that although the FBI had identified a single document of approximately 120 pages, it would take approximately 29 months to produce this single document because of the backlog in the agency's FOIA Requests. The representative indicated that Brady could break up its request into 50-page increments to allow for quicker processing since "small track" requests are on an 8-month processing timeline. However, the representative acknowledged that by the time we received productions to the three requests, for two productions of 50 pages and one production of 20 pages respectively, Brady would have a similar timeline to that of the medium-track production. Counsel for Brady inquired as to whether the document included a table of contents or an index that might allow Brady to target specific sections of the NICS SOPs rather than requesting randomly selected pages. The representative replied, that no table of contents or similar item appeared to exist in the

120 responsive pages that would help narrow the request further. Brady indicated that it would consider its options and schedule a subsequent phone call.

49. The representative's representation that no table of contents or index is inconsistent with prior productions of heavily redacted SOPs in the *Sanders* civil litigation. In the *Sanders* civil litigation, a handful of NICS SOPs were publicly filed (Exhibit A at 8-102): SOP 1.3 (1 page), SOP 3.4 (9 pages), SOP 5.0 (5 pages), SOP 5.4.7 (10 pages), SOP 5.5.3 (1 page), SOP 5.5.4 (12 pages), SOP 5.5.5 (17 pages), SOP 5.10 (7 pages). The numbering system of these SOPs suggests that some kind of index or table of contents likely exists that provides more information regarding how to find information in the SOPs. Further, the length of just this small production of the SOPs—totaling 62 pages—also suggests that the 120-page document identified by the FBI as being the only document responsive to the NICS SOPs Request may also not be accurate. The NICS SOPs Request calls for the production of current *and historic* NICS SOPs.

50. On the July 8 Call, Brady and the representative also discussed the prospects of elevating these requests for expedited consideration. The representative noted that as a practical matter, expedited requests were only being granted to prisoners on death row.

51. On July 16, 2020, Brady spoke to the representative again regarding its request. With no table of contents or other index available to guide the selection of 50 pages within the single responsive document, Brady indicated that they were not interested in blindly selecting 50 pages for processing on the "small track." Instead, Brady indicated that they were interested in elevating the NICS SOP Request for consideration for expedited processing and requested more information regarding how to do that procedurally. The representative indicated that Brady could submit a request directly via email.

52. On July 22, 2020, Brady requested expedited processing of the NICS SOPs Request via email to the representative. (Exhibit B at 11-12.) In the request for expedited processing, Brady highlighted that the FBI was able to produce a timely, albeit deficient response, within 19 days pursuant to a similar FOIA request by Brady on October 29, 2018, and that the FBI was able to produce the entire set of NICS SOPs within one week in the *Sanders* case.

53. On July 24, 2020, the FBI Information Management Division acknowledged and immediately denied Brady's request for expedited processing of FOIA Request No. 1451131-000 via letters received on the same day.

54. To date, Brady has not received a substantive determination from the FBI, a single page in response to the NICS SOPs Request, nor an approval or denial of Brady's request for a fee waiver.

55. Brady has exhausted its administrative remedies with respect to FOIA Request No. 1451131-000 because the FBI failed to appropriately respond within the statutory time limit.

**FOIA Request No. 1471421-000 NICS Background Check Processing During COVID-19 Pandemic**

56. On July 22, 2020, Brady submitted the COVID-19 Request, seeking information on how the COVID-19 pandemic has impacted NICS' ability process background checks, including:

1. Any and all documents indicating the total number of background checks conducted and completed within the three-business-day "default proceed" period;

2. Any and all documents indicating the number of delayed background checks that were not completed within the "default proceed" period;

3. Any and all documents indicating (i) the number of background checks that were denied immediately, (ii) the number of delayed background checks that were denied on each business day during the "default proceed" period, and (iii) the number of delayed background checks that were denied on each business day following the expiration of the "default proceed" period;

4. Any and all documents indicating the number of delayed background checks that were proceeded following the expiration of the "default proceed" period, and, separately, any and all documents indicating the number of background checks that were denied following the expiration of the "default proceed" period;

5. Any and all documents related to the number of NICS examiners conducting background checks during the COVID-19 pandemic, including any and all documents regarding how those numbers compare to the number of NICS examiners conducting background before the COVID-19 pandemic;

6. Any and all documents related to that number of NICS examiners who are unable to work for any period of time as a result of the COVID-19 pandemic, the reason for their absence, and the length of their absence;

7. Any and all documents related to guidance or flexible work arrangements provided to NICS examiners and the percentage of NICS examiners who are using a flexible work arrangement; and

8. Any and all documents explaining or describing the policies, procedures, or other guidance provided to NICS examiners by the FBI, including any new or additional processes and procedures, during the COVID-19 pandemic.

57. The COVID-19 Request also requested a fee waiver.

58. A true and correct copy of the COVID-19 Request is attached as <u>Exhibit C</u>.

59. This request was acknowledged on July 27, 2020 and was subsequently docketed as FOIA Request No. 1471421-000 NICS Background Check Processing During COVID-19 Pandemic. On the same date, the FBI Information Management Division also immediately denied Brady's request for expedited processing of FOIA Request No. 1471421-000 via letter.

60. Brady subsequently learned in late July or early August that the gun violence prevention group Everytown filed a FOIA request in April 2020 that was quite similar to parts of Brady's COVID-19 Request, requesting NICS data from January to March 2019 and January to March 2020.[22] Despite the similarity in the requests, the FBI's treatment of each has differed substantially. In contrast to Brady's COVID-19 Request, which has gone unanswered for over 5 months, the FBI responded to Everytown's FOIA request and produced documents within approximately three months—a production that included data that would also be responsive to Brady Center's COVID-19 Request. Further, it appears that the FBI even supplemented its

---

[22] Swan, *supra* n. 15.

response to the Everytown FOIA Request to provide data through July 2020, despite further neglecting to respond to Brady's COVID-19 Request.[23]

61. In an effort to preserve agency resources and avoid unnecessary litigation, Brady sought to narrow the scope of its COVID-19 Request to eliminate materials that have already been made publicly available in response to Everytown's FOIA request. On October 16, 2020, Brady contacted the representative from the Negotiation Team to discuss what it would mean to possibly narrow the COVID-19 Request. (Exhibit B at 8-9.) On October 19, 2020, the Negotiation Team noted that it would be possible to change the COVID-19 Request from a "medium track" request to a "small track" request by eliminating three potentially responsive pages that the FBI had identified. (*Id.* at 7-8.) On the same date, Brady responded by asking whether the estimated completion date calculation for the "small track" request would be calculated as of the initial date of the request, July 22, 2020. (*Id.* at 7.) The Negotiation Team responded shortly thereafter noting that the original estimated completion dates had been revised since the FBI's review "returned to full staffing, with small track requests currently estimated at approximately four months to complete" and with medium track requests "still averaging approximately 27 months," and subsequently noting that the estimated completion dates were calculated as of the date of the original request. (*Id.* at 6.) By Brady's calculation, the COVID-19 Request would then have a November 22, 2020 estimated completion date if it agreed to reduce the scope of the COVID-19 Request to the "short track."

62. Subsequently, through multiple email requests between October 22, 2020 and November 10, 2020, Brady requested that the Negotiation Team take efforts to provide a concrete production deadline (or engage someone with the authority to do so) for the COVID-19

---

[23] McEvoy, *supra* n. 19.

Request. (*Id.* at 2-5). Brady also made the Negotiation Team aware of its intent to engage in litigation and file a complaint if it was unable to ensure quicker compliance with the NICS and COVID-19 Requests. The Negotiation Team repeated that completion dates were merely estimates, and that they could not provide an absolute production deadline for either request.

63. Despite the Negotiation Team's failure to commit to a firmer production deadline, Brady agreed to narrow the scope of its COVID-19 Request on November 12, 2020 with the expectation that a production by the FBI was imminent. (*Id.* at 1-2.) The Negotiation Team provided a letter to Brady on November 16, 2020 confirming that the scope of the COVID-19 Request was narrowed and that the request had been re-categorized as a "short track" request. (*Id.* at 1.)

64. In response to Brady's request for the Negotiation Team to seek out someone with the authority to ensure quicker compliance with the COVID-19 Request and the NICS Request, the Negotiation Team referred Brady to the Office of Government Information Services and the FBI FOIA Public Liaison.

65. On December 9, 2020, as directed by the Negotiation Team, Brady reached out to the FBI's FOIA Public Liaison, again noting its intent to avoid unnecessary litigation by seeking assurances that the FBI would ensure compliance with the NICS Request and the COVID-19 Request. Brady received an email response from the FBI Public Information Officer (the "FBI PIO") on December 10, 2020 (a true and correct copy of which is attached as <u>Exhibit F</u>).

66. In that email, the FBI PIO provided no assurances that the FBI would respond to the NICS Request and the COVID-19 Request in a timely fashion. Instead, the FBI PIO's update made it clear that Brady should not expect any imminent production on either the NICS Request or the COVID-19 Request.

67. Specifically, the FBI PIO provided an update that the NICS Request had not yet been assigned a Disclosure Analyst (who would then begin the lengthy process of reviewing records to determine if any redactions were necessary), and noted an estimated completion date of February 2022. The FBI PIO also noted while a Disclosure Analyst had been assigned to the COVID-19 Request, that its completion date was estimated to be March 2021 (and not the November 22, 2020 completion date expected by Brady when it agreed to narrow the scope of the request to meet the "small track" categorization). The FBI PIO made no further assurances that the FBI would ensure that its response to the NICS Request or COVID-19 Request would be timely. Instead, the FBI PIO noted: "Please remember that the FBI receives a voluminous amount of requests on a daily, weekly, monthly, and annual basis. Your continued patience is appreciated."

68. To date, Brady has not received a substantive determination from the FBI nor an approval or denial of Brady's request for a fee waiver.

69. Brady has exhausted its administrative remedies with respect to FOIA Request No. 1471421-000 because the FBI failed to appropriately respond within the statutory time limit.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE

**(Failure to Produce Records in Response to the NICS SOPs Request Under FOIA)**

70. Brady re-alleges and incorporates by reference all preceding paragraphs.

71. Brady, through the NICS SOPs Request, properly requested records within the FBI's control pursuant to 5 U.S.C. § 552.

72. The FBI has neither produced any records to Brady in response to the NICS SOPs Request, nor made any explicit justified claims of statutory exemption.

73. The FBI told Brady that the expected completion date of the NICS SOPs Request is 29 months from the opening of the request on October 29, 2019.

74. The FBI has violated FOIA's mandate to make a "determination" regarding the NICS SOPs Request within 20 business days of its receipt and made no request for an extension pursuant to "unusual circumstances." 5 U.S.C. § 552(a)(6)(A)(i); 5 U.S.C. § 552(a)(6)(B)(i).

75. The FBI has violated FOIA's mandate to release agency records to the public by failing to make records that Brady specifically requested "promptly available." 5 U.S.C. § 552(a)(3)(A), 552(a)(4)(B).

76. The FBI's projected timeline on Brady's NICS SOPs Request constitutes a *de facto* denial, violates FOIA's prompt production requirements, and results in an unlawful withholding of non-exempt documents. *See Seavey v. Dep't of Justice*, 266 F. Supp. 3d 241, 246 (D.D.C. 2017).

77. Brady has exhausted the applicable administrative remedies with respect to Defendant FBI's wrongful withholding of the records requested in the NICS SOPs Request.

78. Accordingly, Brady is entitled to injunctive and declaratory relief with respect to the release and disclosure of the records requested in the NICS SOPs Request.

## CLAIM TWO

**(Failure to Produce Records in Response to the COVID-19 Request Under FOIA)**

1. Brady re-alleges and incorporates by reference all preceding paragraphs.

2. Brady, through the COVID-19 Request, properly requested records within the FBI's control pursuant to 5 U.S.C. § 552.

3. The FBI has neither produced any records to Brady in response to the COVID-19 Request, nor made any explicit justified claims of statutory exemption.

4. Approximately 5 months after submission of the COVID-19 Request, after Brady agreed to narrow the scope of the COVID-19 Request so that it would fall on the small track request, and after the FBI has provided two conflicting completion dates (one of which has passed already), the expected timeline for completion of the COVID-19 Request remains unclear.

5. The FBI has violated FOIA's mandate to make a "determination" regarding the COVID-19 Request within 20 business days of its receipt and made no request for an extension pursuant to "unusual circumstances." 5 U.S.C. § 552(a)(6)(A)(i); 5 U.S.C. § 552(a)(6)(B)(i).

6. The FBI has violated FOIA's mandate to release agency records to the public by failing to make records that Brady specifically requested "promptly available." 5 U.S.C. § 552(a)(3)(A), 552(a)(4)(B).

7. The FBI's projected timeline on Brady's COVID-19 Request constitutes a *de facto* denial, violates FOIA's prompt production requirements, and results in an unlawful withholding of non-exempt documents. *See Seavey*, 266 F. Supp. 3d at 246.

8.   Brady has exhausted the applicable administrative remedies with respect to Defendant FBI's wrongful withholding of the records requested in the COVID-19 Request.

9.   Accordingly, Brady is entitled to injunctive and declaratory relief with respect to the release and disclosure of the records requested in the COVID-19 Request.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court:

1) Declare that the FBI violated the Freedom of Information Act by failing to lawfully and timely satisfy Brady's NICS SOPs Request and COVID-19 Request;

2) Order the FBI, within 20 days of the entry of an order from this court, to conduct a search that is reasonably likely to lead to the discovery of any and all records responsive to Brady's FOIA Requests;

3) Order the FBI, within 30 days of the entry of an order from this court, to demonstrate that it has conducted an adequate search for each of the FOIA Requests;

4) Order the FBI, within 60 days of the entry of an order from this court, to produce to Brady any and all non-exempt records or portions of records responsive to Brady's FOIA Requests, as well as a *Vaughn* index of any records or portions of records withheld due to a claim of exemption, at no cost to Brady;

5) Enjoin the FBI from failing or refusing to produce all non-exempt records responsive to Brady's FOIA Requests or otherwise demonstrate that requested records are exempt from production within the time period required by FOIA or, in the alternative, within a reasonable period of time;

6) Award Brady its costs and attorney's fees and other litigation costs reasonably incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E);

7) Grant Brady its request for a fee waiver for both FOIPA Request Nos. 1451131-000 and 1471421-000;

8) Retain jurisdiction of this action to ensure the processing of Brady's FOIA Requests and that no agency records are wrongfully withheld; and

9)  Grant such other and further relief as the Court may deem just and proper.


DATED January 19, 2021

Respectfully submitted,
*/s/ Holly E. Loiseau*
(D.C. Bar No. 452442)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
Tel: (202) 682-7144
Fax: (202) 857-0940
holly.loiseau@weil.com

Kayleigh Golish (*pro hac vice* to be filed)
Amama Rasani (*pro hac vice* to be filed)
Alex Walsh (*pro hac vice* to be filed)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
(212) 310-8000

*Attorneys for the Brady Center*
*to Prevent Gun Violence*