# EXHIBIT C

**Weil, Gotshal & Manges LLP**

2001 M Street, NW Suite 600
Washington, DC 20036
+1 202 682 7000 tel
+1 202 857 0940 fax

**Holly E. Loiseau**
+1 (202) 682-7144
holly.loiseau@weil.com

Via Electronic Submission
through eFOIPA Portal

July 21, 2020

Federal Bureau of Investigation
Attn: Public Information Officer
Information Management Division
170 Marcel Drive
Winchester, VA 22602-4843

Re: **FREEDOM OF INFORMATION ACT EXPEDITED REQUEST FOR DOCUMENTS RELATED TO THE NICS BACKGROUND CHECK PROCESS DURING THE COVID-19 PANDEMIC**

Dear Sir or Madam:

    Pursuant to the Freedom of Information Act ("**FOIA**")[1] and Department of Justice regulations[2] Weil, Gotshal & Manges LLP hereby submits this expedited FOIA request on behalf of our client, The Brady Center to Prevent Gun Violence ("**Brady Center**"). The Brady Center requests that the Federal Bureau of Investigation ("**FBI**") produce the following records related to the National Instant Criminal Background Check Systems ("**NICS**") during the COVID-19 pandemic, *i.e.*, for each month in 2020 and for each week beginning March 1, 2020 and thereafter through June 30, 2020:

1. Any and all documents indicating the total number of background checks[3] conducted and completed within the three-business-day "default proceed" period;[4]

2. Any and all documents indicating the number of delayed background checks that were not completed within the "default proceed" period;

3. Any and all documents indicating (i) the number of background checks that were denied immediately, (ii) the number of delayed background checks that were denied on each business day during the "default proceed" period, and (iii) the number of delayed

---

[1] 5 U.S.C. § 522, *et seq*.
[2] 28 CFR § 16.5(e).
[3] The Brady Center recognizes that the FBI released a report representing the number of firearms background checks initiated through the NICS from November 1998 to June 30, 2020. The report stated that 3,931,607 background checks were initiated through the NICS system in June 2020. NICS Firearm Background Checks, Federal Bureau of Investigations, available at https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf/view. This expedited FOIA request seeks information in addition to the figures released in this report.
[4] The "default proceed" period is also known as the "Brady Transaction" period.

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 2

      background checks that were denied on each business day following the expiration of the "default proceed" period;

4. Any and all documents indicating the number of delayed background checks that were proceeded following the expiration of the "default proceed" period, and, separately, any and all documents indicating the number of background checks that were denied following the expiration of the "default proceed" period;

5. Any and all documents related to the number of NICS examiners conducting background checks during the COVID-19 pandemic, including any and all documents regarding how those numbers compare to the number of NICS examiners conducting background before the COVID-19 pandemic;

6. Any and all documents related to that number of NICS examiners who are unable to work for any period of time as a result of the COVID-19 pandemic, the reason for their absence, and the length of their absence;

7. Any and all documents related to guidance or flexible work arrangements provided to NICS examiners and the percentage of NICS examiners who are using a flexible work arrangement; and

8. Any and all documents explaining or describing the policies, procedures, or other guidance provided to NICS examiners by the FBI, including any new or additional processes and procedures, during the COVID-19 pandemic.

## BASIS FOR EXPEDITED REQUEST

**I. Increased gun sales during the COVID-19 pandemic is a matter of widespread media interest that raises questions about the government's ability to respond.**

      This request qualifies for expedited processing because the FBI's handling of the dramatic increase in gun sales during the COVID-19 pandemic is a "matter of widespread . . . media interest."[5] "Neither FOIA nor [DOJ] regulations require the requester to prove wrongdoing by the government in order to obtain documents on an expedited basis."[6] Rather, "[t]he request must simply provide grounds to support the contention that the matter is time sensitive" and that "there exist *possible* questions about the government's integrity that affect public confidence."[7] This is because FOIA protects the right of the public "to know 'what their Government is up to.'"[8] The American public is already clearly deeply concerned about the sharp increase in gun purchases within the span of just one month during the

---

[5] 28 C.F.R. § 16.5(e)(1)(iv).
[6] *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, No. 19-1552 (ABJ), 2020 WL 515884, at *6 (D.D.C. Jan. 31, 2020).
[7] *Id.* (citing 28 C.F.R. § 16.5(e)(1)(iv)) (emphasis Judge Jackson's).
[8] *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (quoting *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 3

COVID-19 pandemic. Indeed, there have been over 5,900 news articles on the shocking increase in gun sales during the COVID-19 pandemic.[9] This dramatic number of news articles indicates that the public's confidence in the integrity of the NICS process and the ability of NICS to process the additional background checks in a timely manner is in question.

    Not only is the news media interested in the rise in gun sales during the COVID-19 pandemic, Congress also shares the concern of the public and the Brady Center. Citing "coronavirus-related anxiety," sixteen Democratic Senators wrote to FBI Director Wray and Acting Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Director Lombardo on April 2, 2020, urging them to "take appropriate steps to promote public safety and responsible firearm ownership in the wake of surging gun sales across the country."[10] The Senators' letter explains that if a background check for a particular individual "is not completed within three business days," federal firearms licensees "may choose to transfer the gun(s) to that individual anyway in what is known as a 'default proceed.'"[11] Indeed, this congressional concern is bipartisan. A separate group of twenty-eight Republican Senators wrote to

---

[9] *See, e.g.*, Stephanie Pagones, *Gun sales break May record amid coronavirus riots*, FOX BUS. (Jun. 2, 2020); Max Matza, *How the coronavirus led to the highest-ever spike in US gun sales*, BBC (Apr. 6, 2020); Thomas Kika, *Coronavirus Economy: Gun Sales Hit Record High Despite Wall Street Downturn, Job Losses*, INT'L BUS. TIMES NEWS (Apr. 5, 2020); Anna Giaritelli, *Fear of coronavirus chaos drives gun purchases for self-defense*, THE EXAMINER (Apr. 5, 2020); *Gun Sales in US Breaks 20-Year Record After Declared as Essential Commodity Amid COVID-19 Lockdown, Over 3.7 Million Guns Sold in March 2020*, LATESTLY (Apr. 4, 2020); Lihesa McCormick, *Gun sales continue to climb in Missouri and Kansas amid COVID-19 pandemic*, FOX-4 WDAF (Apr. 3, 2020); Maya Prabhu, *DIGGING DEEPER: Georgia law bars limiting of gun sales during pandemic*, THE ATLANTA-JOURNAL CONST. (Apr. 3, 2020); Kathy Curran, *Gun sales soar in mass. amid coronavirus pandemic*, WCVB 5 (Apr. 3, 2020); *Gun sales surge 85 percent*, FOX 5 N.Y. (Apr. 3, 2020); Xander Landen, *Vermont gun background checks hit record high in March*, VTDIGGER (Apr. 3, 2020); Matt Bise, *Pandemic gun sales: "I've never been picked clean like this. It's scary."*, POST & COURIER (Apr. 2, 2020); Anna Giaritelli, *FBI performs record number of gun sale background checks in March as coronavirus rages*, THE EXAMINER (Apr. 2, 2020); Keith Collins and David Yaffe-Bellany, *About 2 Million Guns Were Sold in the U.S. as Virus Fears Spread*, N.Y. TIMES (Apr. 2, 2020); Danny Hakim, *Ailing N.R.A. Finds New Rallying Cry: Keep Gun Shops Open*, N.Y. TIMES (Apr. 2, 2020); Hayley Miller, *FBI Reports Staggering 3.7 Million Firearm Background Checks in March*, HUFFPO (Apr. 2, 2020); Josh Campbell, *FBI sees spike in gun sale background checks amid coronavirus pandemic*, CNN (Apr. 2, 2020); Zusha Elinson, *Gun Background Checks Hit Record in March, Sparked by Coronavirus Fears; The proxy for firearm sales hit an all-time high as Americans worry about social breakdown and prisoner releases*, WALL STREET JOURNAL (Apr. 2, 2020); Zachary Petrizzo, *Coronavirus Spurs Historic Buying Spree of 2 Million Guns,* MEDIAITE (Apr. 2, 2020); Stephen Dinan, *Gun sales up 85% in March amid coronavirus fears*, THE WASH. TIMES (Apr. 2, 2020); Lisa Marie Pane, *Gun background checks smash records amid coronavirus fears*, AP NEWS (Apr. 1, 2020); *Everytown, Moms Demand Action Respond to New FBI Data Showing Increase in Background Checks*, MOMS DEMAND ACTION (Apr. 1, 2020); Tyler Vazquez, *Coronavirus: Fear drive 'unprecedented' gun and ammunition sales in Brevard County*, FLORIDA TODAY (Mar. 25, 2020); Kurtis Lee and Anita Chabria, *As the coronavirus pandemic grows, gun sales are surging in many states*, L.A. TIMES (Mar. 16, 2020); Richard A. Oppel Jr., *For Some Buyers With Virus Fears, the Priority Isn't Toilet Paper. It's Guns.*, N.Y. TIMES (Mar. 16, 2020).

[10] Letter from Senators Markey, Blumenthal, Murphy, et al., to Hon. Christopher Wray, Dir. FBI, and Hon. Regina Lombardo, Acting Dir. ATF (Apr. 2, 2020) (hereinafter "Markey Letter"), *available at* https://www.markey.senate.gov/download/fbi-atf-letter-on-surging-gun-sales.

[11] *Id.* at 1.

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 4

Director Wray and Director Lombardo on May 5, 2020, "seeking additional information on the impact the coronavirus has had on your agencies and the firearm transfer process."[12]

Like the Brady Center, the Senators worry that "the coronavirus pandemic could overwhelm NICS and allow prohibited individuals to obtain firearms through 'default proceeds.'"[13] Furthermore, the Brady Center understands that the House Judiciary Committee may have already sent a similar letter to the FBI. The extensive reporting by the media and the attention of both houses of Congress to this issue clearly demonstrates that this is a matter of pressing public concern. Therefore, the Brady Center is entitled to have this request processed on an expedited basis.

## II.     Failure to expedite processing of this request could pose an imminent threat to the life or physical safety of an individual.

This request also qualifies for expedited processing under 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e). The Brady Center seeks information related to NICS background checks during the COVID-19 pandemic national emergency as soon as possible because the dramatic increase in gun purchases poses an imminent threat to the public.[14]

The FBI's own statistics on monthly background checks—a proxy for gun sales—indicate that the number of gun sales have dramatically increased from last year's figures.[15] In the first six months of 2020, there have been over 19,000,000 background checks, an increase of 5,300,000 from the same period last year.[16] These monthly comparisons between 2019 and 2020 are both striking and alarming:

- Over 745,000 more checks in February 2020 than February 2019 (a 36 percent increase);
- At least 1,000,000 more checks in March 2020 than in March 2019 (a 41 percent increase);
- At least 575,000 more checks in April 2020 than in April 2019 (a 25 percent increase);
- At least 740,000 more checks in May 2020 than in May 2019 (a 32 percent increase); and
- At least 1,615,000 more checks in June 2020 than in June 2019 (a 70 percent increase).

The graph below illustrates the impact of COVID-19 on gun sales.

---

[12] Letter from Senators Capito, Cornyn, Cruz, et al., to Hon. Christopher Wray, Dir. FBI, and Hon. Regina Lombardo, Acting Dir. ATF (May 5, 2020), *available at* https://www.capito.senate.gov/download/05-04-2020-capito-nics-covid-letter.
[13] Markey Letter, *supra* note 9, at 2.
[14] 28 C.F.R. § 16.5(e)1)(i).
[15] NICS Firearm Background Checks, Federal Bureau of Investigation, *available at* https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf/view.
[16] *Id.*

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 5



      If NICS is unable to timely process each background check, many more guns could fall into the hands of prohibited purchasers who would, under normal circumstances, be deemed ineligible to possess a gun due to the risk they pose to themselves and others.[17] This could occur under the "default proceed" process, where gun purchases effectively can be approved for potentially dangerous individuals who are legally prohibited from possessing a gun. While most background checks are completed in a matter of minutes, NICS sometimes needs to contact local law enforcement personnel to examine additional records.[18] COVID-19 and the growing civil unrest and protests around the country are undoubtedly making it more difficult for local law enforcement agencies to provide NICS examiners with the requested information on a timely basis. In the case of a firearm procured unlawfully through a "default proceed," the firearm would remain in the possession of the prohibited purchaser until the NICS is able to provide final disposition of the prohibited purchaser's background check and ATF is able to retrieve the firearm. While the unprecedented COVID-19 pandemic in still ongoing, this process may take months—or even years—longer than it normally would. ATF's National Tracing Center is already short-staffed, and ATF's own data show that it often takes law enforcement years to retrieve guns under normal circumstances.[19]

---

[17] The Gun Control Act of 1968, codified at 18 U.S.C. § 920, *et seq.*, for instance, prohibits the sale to, and possession of firearms by, a person who, among other things, has (i) been found to have harassed, stalked, or threatened an intimate partner or family member such that the victim has been placed in a reasonable fear of bodily injury; (ii) has been convicted of an offense of domestic violence; (iii) has been convicted of a serious crime, including a crime of violence; (iv) has been found to be a danger to themselves or others.

[18] *See* WILLIAM J. KROUSE, CONG. RESEARCH SERV., R45970, GUN CONTROL: NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM (NICS) OPERATIONS AND RELATED LEGISLATION 30-31 (2019).

[19] Dan Frosch and Zusha Elinson, *Armed and Dangerous: How the ATF Retrieves Guns from Banned Buyers*, WALL STREET JOURNAL (Feb. 19, 2019); ATF: NTC Firearms Trace Data – 2018, *available at* https://www.atf.gov/resource-

This sudden, sharp increase in sales is not only alarming and taxing on NICS and the ATF's limited recovery resources, but it is also life threatening. Even one gun falling into the wrong hands could threaten the safety of another, as "default proceed" sales are eight times more likely to involve a prohibited purchaser than other sales.[20] This is not mere conjecture. A recent UC Davis Violence Prevention Program report states that the "2.1 million additional firearms purchased from March through May 2020 . . . represents a 64% increase over the expected volume of purchases."[21] The spike in firearms purchases is an imminent threat to the life or physical safety of potentially hundreds of people, as the study calculates, controlling for the effects of COVID-19 common to all states, "an almost 8% increase in firearm violence, or 776 more injuries than expected in March through May in the U.S. had no spike in firearm purchases occurred."[22]

Therefore, the Brady Center is entitled to have this request processed on an expedited basis because, as the data indicates, a "failure to obtain an expedited FOIA response" on the above matters "'could reasonably be expected to pose an imminent threat to the life or physical safety of an individual.'"[23] Indeed, the State Department recently recognized that a FOIA request for information regarding the use of three-dimensional printers to create guns similarly satisfied this "imminent threat" standard for expedited processing because the documents were "necessary to ensuring the physical safety" of the public.[24] The nexus of the imminent harm is even closer in this present request. It is logical that the skyrocketing demand for guns coupled with the uncertainty in the ability of NICS examiners to complete background checks in time will likely result in even more firearms falling into the hands of prohibited purchasers.

### III. The Brady Center urgently seeks to inform the public about government's ability to perform background checks during the COVID-19 pandemic.

Finally, the Brady Center's request qualifies for expedited processing because the Brady Center is "primarily engaged in disseminating information" and seeks to "urgent[ly] inform the public about an

---

center/firearms-trace-data-2018. *See also* OFFICE OF THE INSPECTOR GEN., DEP'T OF JUSTICE, REVIEW OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' ENFORCEMENT OF BRADY ACT VIOLATIONS IDENTIFIED THROUGH THE NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM 17 (2004), *available at* https://oig.justice.gov/reports/ATF/e0406/exec.htm.

[20] *See* FIXING THE DEFAULT PROCEED FLAW, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE (2017); *see also* Letter from Thomas E. Bush, III, Assistant Director, CJIS Division, FBI, to Michael R. Bloomberg, Mayor of N.Y.C. (Oct. 21, 2008), *available at* http://everytown.org/documents/2016/10/2008_10_21-fbi-letter.pdf.

[21] UC Davis Health, *Firearm purchasing during pademic's onset linked to higher rates of firearm violence in U.S.* (July 6, 2020), *available at* https://health.ucdavis.edu/health-news/newsroom/surge-in-firearm-purchasing-during-pandemics-onset-linked-to-higher-rates-of-firearm-violence-in-us-/2020/07.

[22] *Id.*

[23] *Hajro v. U.S.C.I.S.*, 832 F. Supp. 2d 1095, 1115 (N.D. Cal. 2016), *rev'd on other grounds*, 811 F.3d 1086 (9th Cir. 2016) (quoting 28 C.F.R. § 16.5(e)(1)(i)).

[24] Compl., ECF No. 1, ¶ 24 & Ex. H, *Brady Ctr. to Prevent Gun Violence v. Dep't of State*, No. 18-cv-03007-JEB (D.D.C. Dec. 19, 2018).

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 7

actual or alleged Federal Government activity."[25] The Brady Center publishes comprehensive reports based on records obtained via its FOIA requests, which in turn often generate substantial media coverage. For instance, a Brady Center FOIA request uncovered that the National Rifle Association's gun lobbyists helped author an ATF white paper on how the Trump Administration planned to reduce regulations on assault weapons, silencers, and gun dealers.[26] This Brady Center report led to widespread reporting.[27] Publishing information "need not be [the organization's] sole occupation"[28] in order to qualify for expedited processing of a FOIA request on this basis. Just as Protect Democracy, in *Protect Democracy Proj. v. Dep't of Defense*, intended "to disseminate the information obtained" and "to inform public understanding on operations and activities of the government" by "gather[ing] and disseminat[ing] information that is likely to contribute significantly to the public understanding of executive branch operations and activities,"[29] the Brady Center intends to do the same here, as it did with its reporting on the ATF white paper.[30]

"The standard of 'urgency to inform' requires that the information requested should pertain to a matter of a current exigency to the American public and that a reasonable person might conclude that the consequences of delaying a response to a FOIA request would compromise a significant recognized interest."[31] Courts have established a three-part test to meet this standard. The court asks "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity."[32] As evidenced by the incredible media and congressional interest regarding the increase in gun sales during COVID-19 and the government's ability to process the increased number of requests, "the subject matter of the request" is "central to a pressing issue of the day."[33] Indeed, the "current exigency" of COVID-19, compounded by the additional strain on law

---

[25] 28 C.F.R. § 16.5(e)(1)(ii); *see also* 5 U.S.C. § 552(a)(6)(E)(v)(II).
[26] Brady Center to Prevent Gun Violence, *Brady Center FOIA Litigation Forces Release of Secret ATF Documents Regarding Gun Lobby Influence of Federal Gun Policy* (Feb. 13, 2018), *available at* https://www.bradyunited.org/press-releases/brady-center-foia-litigation-forces-release-of-secret-atf-documents-regarding-gun-lobby-influence-of-federal-gun-policy.
[27] *See, e.g.*, Ali Watkins, *How the N.R.A. Keeps Federal Gun Regulators in Check*, N.Y. TIMES (Feb. 22, 2018); Josh Pagliery, *Exclusive: Gun lobbyist helped write ATF official's proposal to deregulate*, CNN INVESTIGATES (Feb. 14, 2018); Khorri Atkinson, *Report: Gun lobbyist helped write ATF deregulation memo*, AXIOS (Feb. 14, 2018); Alison R. Parker, *Gun safety group exposes secret NRA lobbyist behind Trump's ATF memo*, AMERICAN INDEPENDENT (Feb. 13, 2018).
[28] *Protect Democracy Proj., Inc. v. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (quoting *Landmark Legal Found. v. E.P.A.*, 910 F. Supp. 2d, 270, 276 (D.D.C. 2012)).
[29] *Id.*
[30] *See also Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F. Supp. 3d 5, 11 (D.D.C. 2019) (finding plaintiff "primarily engaged in disseminating information" because it intended "to produce one or more original investigative reports based on the analysis of the requested information").
[31] H.R. Rep. No. 104–795, at 26 (1996).
[32] *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001).
[33] *Wadleton v. Dep't of State*, 941 F. Supp. 2d 120, 123 (D.D.C. 2013).

enforcement as a result of the growing civil unrest and protests sweeping the nation, establishes a "substantial interest, either on the part of the American public or the media."[34]

The analogous regulations promulgated by the Departments of Defense and State are instructive. "The existence of numerous articles published on a given subject can be helpful in establishing the requirement that there be an 'urgency to inform' the public on a topic."[35] Furthermore, the consequences of delaying response would compromise a significant recognized interest because if production is unduly delayed both the Brady Center and the public at large will be "precluded . . . from obtaining in a timely fashion information vital to the current and ongoing debate surrounding" public safety, gun sales, and government action during COVID-19.[36] "Being closed off from such a debate is itself a harm to open democracy."[37] But there is another potential harm too: the possibility of someone who should never have been allowed to purchase a gun using it against another person. "By then, any damage will have been done."[38] In short, the Brady Center has demonstrated an urgency to inform the public.

## FORMAT AND PRODUCTION REQUESTS

The term "document" shall mean all of the following, without limitation and by way of description: (a) all printed materials of every kind whatsoever; (b) all handwritten materials of every kind whatsoever; (c) all materials in electronic media regardless of the forms of such media, including emails; (d) all drafts of subject documents; (e) all documents referenced in subject documents, including those noted as exhibits and attachments, as well as those referenced in the bodies of subject documents or in footnotes to subject documents; (f) all documents, otherwise identified, but containing marginal or other annotations, handwritten or otherwise; (g) all documents in the form of transcripts of meetings and telephone conversations and memoranda of such meetings and telephone conversations, whether printed or handwritten; (h) to the extent not covered by the definitions in (a)–(g), all materials generated by or received by any government employee, consultant or other person having any relationship to the government; (i) to the extent not covered by the definitions in (a)–(h), all materials generated by any person not in the employ of the government, including but not limited to lawyers, foreign government officials of every level, other interested parties and non-parties to any communications on any relevant subject.

Responsive documents are requested to be produced in their entirety, including all attachments, enclosures, and exhibits. FOIA regulations provide that, if some parts of records containing the requested information fall within the statutory exemptions to mandatory disclosure, the non-exempt

---

[34] *Al-Fayed*, 254 F.3d at 310.
[35] 32 C.F.R. § 286.8(e)(3) (Defense); *accord* 22 C.F.R. § 171.11 (State).
[36] *Protect Democracy Proj.*, 263 F. Supp. 3d at 299.
[37] *See Elec. Frontier Found. v. Office of Dir. of Nat. Intelligence*, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007) ("[O]ngoing public and congressional debates about issues of vital national importance cannot be restarted or wound back.").
[38] *Protect Democracy Proj.* 263 F. Supp. 3d at 300; *see also Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("[S]tale information is of little value.").

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 9

material shall be disclosed after the exempt material has been deleted.[39] Accordingly, if FBI determines that some portion of a record that is otherwise responsive to this request is exempt, we request that FBI provide a copy of all reasonably segregable, non-exempt portions of the record. If the requested records are not in the possession of FBI or its agents, we request that FBI identify all federal agencies and/or other individuals and entities believed to possess such documents. To the extent that FBI dete1mines that any subject document cannot be disclosed, we request that such documents be identified in accordance with *Vaughn v. Rosen*, 523 F.2d 1136.

The Brady Center further requests that, pursuant to 5 U.S.C. § 522(a)(3)(B), the FBI produce responsive documents in the native electronic format in which the document was created. To the extent that the FBI is unable to produce the responsive documents in the requested format, the Brady Center requests confirmation that the record does not exist in native format and production of the documents in the following format, listed in order of the Brady Center's preference: (1) PDF format or (2) paper copy.

The Brady Center requests that the FBI produce these documents within twenty (20) working days as required by FOIA. Additionally, in accordance with Section 7 of the OPEN Government Act of 2007, Pub. L. No. 110-175, and pursuant to Attorney General Holder's FOIA Memorandum of March 19, 2009, the Brady Center requests that the FBI provide the individualized tracking number associated with this request should the request take longer than 10 days to process.

## FEE WAIVER REQUEST

Pursuant to 31 C.F.R. § 1.7(d), this request qualifies for a fee waiver because the requested information will be used for a public interest purpose and not for commercial purposes. The Brady Center is a 501(c)(3) non-profit dedicated to creating a safer America by cutting gun deaths in half by 2025. The requested information will be used to educate the public and further this goal. In the past, federal agencies have granted the Brady Center (previously known as the Center to Prevent Handgun Violence) a fee waiver under like circumstances.[40]

The Brady Center appreciates your prompt consideration of this request. If you have any questions, or if the Brady Center can be of any assistance in expediting this request, please contact us using the information in the signature blocks below.

---

[39] *See* 5 U.S.C. § 522(b); 28 C.P.R. § 16.6.
[40] *See*, *e.g.*, *Center to Prevent Handgun Violence v. Dep't of the Treasury*, 49 F.Supp.2d 3, 5 (D.D.C. 1999) (acknowledging the Bureau of Alcohol, Tobacco, Firearms and Explosives's past grant of a fee waiver to the Brady Center for a similar request of government records).

**Weil, Gotshal & Manges LLP**

July 21, 2020
Page 10

                Sincerely,

By:    /s/ Holly E. Loiseau

       Holly E. Loiseau
       WEIL, GOTSHAL & MANGES LLP
       2001 M Street, NW Suite 600
       Washington, DC 20036
       T: (202) 682-7144
       Holly.Loiseau@Weil.com

*Attorney for The Brady Center
to Prevent Gun Violence.*

cc:    Joshua Scharff
       Tess Fardon
       Kayleigh Golish
       Alex Walsh
       Amama Rasani
       John Lapin