UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **THE BRADY CENTER TO PREVENT GUN VIOLENCE**, <br><br> Plaintiff, <br><br> v. <br><br> **FEDERAL BUREAU OF INVESTIGATION**, <br><br> Defendant. | Case No. 21-CV-0166 (CRC) |

## MEMORANDUM OPINION AND ORDER

Gun violence plagues the United States, claiming countless innocent lives every year. In the aftermath of a mass shooting at the Emanuel AME Church in Charleston, South Carolina, the Brady Center to Prevent Gun Violence filed a Freedom of Information Act request with the Federal Bureau of Investigation to learn more about how the FBI conducts background checks on firearm purchasers. The FBI processed 4,491 pages of records and produced 2,808 pages in response to that request, but withheld parts of documents under FOIA Exemption 7(E), which shields records that, if disclosed, would reveal secret law-enforcement techniques.

The Brady Center challenged the FBI's withholdings in this suit, and both parties now seek summary judgment. Because the FBI has failed to adequately explain how disclosure could create a risk of circumvention of the law, the Court will deny both parties' motions without prejudice and direct the FBI to either produce the withheld documents or file a renewed motion for summary judgment with a more detailed explanation of why the withheld records are exempt from disclosure.

## I. Background

The FBI conducts background checks on people who purchase firearms from a federally licensed dealer. To do so, it operates the National Instant Criminal Background Check System ("NICS"). Gun-control advocates have criticized NICS, claiming that it sometimes lets individuals ineligible to purchase a firearm slip through the cracks.

Seeking to learn more about how the FBI operates NICS, the Brady Center filed a FOIA request in October 2019 with the FBI seeking its NICS standard operating procedures ("SOPs"). After the FBI failed to produce responsive documents within the statutory deadline, the Brady Center filed this suit. The FBI then proceeded to process the Brady Center's request. It processed 4,491 pages and produced 2,808 pages, but withheld parts under various FOIA exemptions. FBI Statement of Uncontested Fact ¶ 6; Seidel Decl. ¶ 20. At issue here are the FBI's withholdings under FOIA Exemption 7(E) across 154 pages of its production. Brady Center MSJ at 3. That exemption shields from disclosure law-enforcement records that, if disclosed, would reveal secret law-enforcement techniques. See 5 U.S.C. § 552(b)(7)(E). The FBI also withheld other parts of responsive records under other exceptions, but the Brady Center does not oppose those withholdings. Brady Center MSJ at 4–5. Nor does it challenge the adequacy of the FBI's search. Id. at 5.

The parties filed cross-motions for summary judgment. The Court heard argument on those motions on February 20, 2025. The motions are ripe for review.

## II. Legal Standard

Summary judgment may be granted when the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(a).  Summary judgment is the typical mechanism to determine whether an agency has met its FOIA obligations.  See, e.g., Jud. Watch, Inc. v. CFPB, 60 F. Supp. 3d 1, 6 (D.D.C. 2014).

To obtain summary judgment on its invocation of a FOIA exemption, the agency must first show that the material falls under an enumerated exemption.  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009).  Agencies can do so by providing sufficiently detailed declarations.  Id.  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  Jud. Watch, Inc. v. DOJ, 715 F.3d 937, 941 (D.C. Cir. 2013) (quotation marks omitted).  Because the primary purpose of FOIA is disclosure, exemptions are construed narrowly.  DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

The agency must also demonstrate that it has produced "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt[.]"  5 U.S.C. § 552(b).  Agencies must explain why non-exempt material is not reasonably segregable, and "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007).

**III. Analysis**

The Court will begin with whether the FBI has adequately supported its invocations of Exemption 7(E).  Concluding it has not, the Court will then address next steps in the case.

A. Exemption 7(E)

As relevant here, the FBI withheld four types of information under Exemption 7(E).  First, it withheld "operational directives and guidelines" that "describe non-public FBI law enforcement procedures and strategies" and "instruct FBI employees on the proper use of these procedures and strategies."  Seidel Decl. ¶ 36.  Second, it held back "the identities of sensitive investigative databases and database search results located through queries of these non-public

databases[.]" Id. ¶ 37.  Third, it redacted "the identity of FBI units involved in the compilation of the NICS SOPs."  Id. ¶ 42.  And fourth, it withheld "the methods the FBI uses to collect and analyze information it obtains for firearm background check determinations."  Id. ¶ 44.

"To justify a withholding under Exemption 7(E), the FBI must demonstrate that: (1) the records were compiled for law enforcement purposes; (2) the redacted information would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions; and (3) the release of the requested information might create a risk of circumvention of the law."  Shapiro v. DOJ, 393 F. Supp. 3d 111, 115 (D.D.C. 2019) (cleaned up).  These criteria impose a "relatively low bar" on the FBI, though it cannot simply offer conclusory explanations to support its withholdings. Kolbusz v. FBI, No. 17-cv-319-EGS-GMH, 2021 WL 1845352, at *24 (D.D.C. Feb. 17, 2021).

The Brady Center does not dispute that the first prong is met here.  Nor could it, because the requested documents were compiled to enable the FBI to perform background checks.

Next, the Court has little trouble concluding that the withheld material, if disclosed, would reveal secret law-enforcement techniques or methods.  "The phrase 'techniques and procedures' . . . refers to how law enforcement officials go about investigating a crime." Whittaker v. DOJ, No. 18-cv-1434-APM, 2019 WL 2569915, at *2 (D.D.C. June 21, 2019) (quoting Allard K. Lowenstein Int'l Human Rights Proj. v. Dep't of Homeland Sec., 626 F.3d 678, 682 (2d Cir. 2010)).  Here, the FBI explains that the withheld information includes (1) guidelines that "not only describe non-public FBI law enforcement procedures and strategies, but also instruct FBI employees on the proper use of these procedures and strategies"; (2) database information that could reveal the scope of the databases and the information at the FBI's disposal when conducting background checks; (3) the units involved in compiling the procedures; and (4)

the methods by which FBI collects information. Seidel Decl. ¶¶ 36, 37, 42, 44. With access to those instructions, the FBI explains, readers could understand "the standards the FBI follows when conducting firearm background checks," the resources and information the FBI brings to bear in these investigations, the units involved, and the methods it employs. Id. All that information plainly reveals how the FBI goes about conducting a background check.

The Brady Center contends that the background check system cannot itself be the technique or procedure for purposes of invoking Exemption 7(E). See Brady Center MSJ at 16. This argument does not hold up because the FBI's methods for conducting a background check fall well within any ordinary understanding of the phrase "techniques and procedures for law enforcement investigations[.]" See 5 U.S.C. § 552(b)(7)(E). Indeed, the Brady Center's own complaint and FOIA requests describe the requested documents as "related to the National Instant Criminal Background Check System ("NICS") standard operating *procedures*[.]" Compl. ¶ 2; Compl. Ex. A at 1.

The Brady Center's cases do not move the needle. Those cases largely involved FOIA requests for the *results* of law enforcement investigations, rather than the documents describing the procedures for conducting them. See Mays v. DEA, 234 F.3d 1324, 1326 (D.C. Cir. 2000) (drug investigation results); Campbell v. DOJ, 164 F.3d 20, 26 (D.C. Cir. 1998) (results of FBI investigation into James Baldwin); Nat'l Pub. Radio v. FBI, 539 F. Supp. 3d 1, 5 (D.D.C. 2021) (ballistics tests results); Davis v. FBI, 770 F. Supp. 2d 93, 96 (D.D.C. 2011) (results of investigation into plaintiff); see also Brady Center MSJ at 16–17 (citing those cases). In those types of cases, courts have held that agencies must explain how the results of an investigation may reveal its methods. See Whittaker, 2019 WL 2569915, at *2 ("Disclosing the results of Plaintiff's [background check] would not necessarily reveal how the FBI 'goes about' collecting

5

information returned from such inquiries."). But here, the FBI has established that disclosing the withheld information—again, contained within the FBI's standard operating *procedures*—would reveal techniques and procedures for law enforcement investigations.

The Brady Center also argues that Exemption 7(E) does not shield the FBI's background check methods because the NICS is widely reported on in the press. Brady Center MSJ at 43–44; see Myrick v. Johnson, 199 F. Supp. 3d 120, 124 (D.D.C. 2016) ("Exemption 7(E) is properly invoked for information and techniques that are secret and 'not generally known to the public.'" (quoting Nat'l Sec. Archive v. FBI, 759 F. Supp. 872, 885 (D.D.C. 1991)). But the FBI's declaration specifies that the withheld material includes nonpublic information. Seidel Decl. ¶¶ 36, 37, 42, 44. That attestation is entitled to a presumption of good faith, SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and the Brady Center has not purported to rebut that presumption by directly linking any of the redactions to official materials in the public record.

With all that said, the Court agrees with the Brady Center on the third prong. The FBI's explanation of how disclosing the withheld materials would enable individuals to circumvent the law is lacking. Of course, as a general matter, revealing law-enforcement methods can enable individuals to counteract them. But here, the FBI has not fully explained how revealing *these* methods could logically create such a risk. Is the FBI concerned that releasing these background-check procedures would enable someone to hide their past criminal convictions or other disqualifying events? How might they do that, when convictions and other transgressions are public record? Or is the concern that prohibited purchasers could avoid detection by altering where or how they make a purchase? If so, how? To the extent there are past examples of

6

people dodging positive hits in these ways, such details, while not required, would be helpful for the Court to understand the risks that disclosure would create.

For a more concrete example, consider SOP 12.2, titled "Contact List and Global Address Book." See Brady Center MSJ Ex. 17. The FBI redacted law enforcement directives and database information from that SOP. Id.; see Seidel Decl. ¶¶ 36–37. As best the Court can tell from the unredacted portions, that SOP appears to describe the steps the FBI takes to update a list containing contact information for state and federal agencies used during background checks. Brady Center MSJ Ex. 17. But it is not at all clear to the Court how a person could use information about how the FBI performs such a basic administrative task to then evade the FBI's background check system. The FBI's declaration offers no explanation.

As another example, the FBI also redacted the names of certain databases that it queries when conducting a background check. Seidel Decl. ¶ 37. The FBI claims that "[k]nowing the database names makes the original source data an attractive target for compromise" and offers "potential firearms prohibited persons the opportunity to corrupt or destroy information stored within these databases." Id. ¶ 40. But the FBI does not explain how merely knowing a database's name—and a non-public database, at that—could compromise that database's security. Contrast that threadbare justification with the FBI's explanation for why it withheld internal FBI phone numbers, fax numbers, and email addresses. See id. ¶ 34. The FBI explained there that it withheld such information because criminals could use it to "appear as if they are from official law enforcement agencies" and "elicit sensitive information" from agents. Id. That kind of specific explanation is precisely what FOIA requires but is lacking in the FBI's explanation of why database names must be withheld in the name of cybersecurity.

7

The FBI also redacted the names of FBI units involved in compiling these SOPs. Seidel Decl. ¶ 42. But how does knowing that, hypothetically, a narcotics unit helped compile the SOPs enable an individual to buy a gun he could not otherwise obtain? Do the SOPs somehow reveal limitations in the various units' capabilities? Again, the FBI's declaration is light on details.

At oral argument, counsel for the FBI analogized the agency declaration in this case to those offered in two of the Court's prior cases: Touarsi v. DOJ, 78 F. Supp. 3d 332 (D.D.C. 2015), and Davis v. FBI, No. 18-cv-86-CRC, 2019 WL 2870729 (D.D.C. July 3, 2019). Both of those cases, however, involved FOIA cases brought by individuals who were investigated by the government for misconduct and later sought the results and methods of those investigations. See Touarsi, 78 F. Supp. 3d at 340; Davis, 2019 WL 2870729, at *1. Once those methods are out in the public, others could, as the agencies explained, change their behavior to avoid the FBI's methods for detecting wrongdoing. See Touarsi, 78 F. Supp. 3d at 348–49; Davis, 2019 WL 2870729, at *10. For example, if disclosure would reveal the locations of any FBI security cameras, then criminals could simply avoid those cameras. All that is entirely logical, which is why the Court granted summary judgment to the agencies in those cases. Here, by contrast, the FBI fails to explain how someone could, for example, use any knowledge gained from the withheld materials to hide prior convictions or other disqualifying transgressions from the FBI's background checks when records of those events may not be easily modified by would-be lawbreakers.

Because the FBI's declaration does not fully answer any of the questions identified above, it has not supplied the necessary logical link for this Court to conclude that all of its

8

withholdings are necessary to avoid a risk of circumvention of the law. The Court therefore must deny the FBI's motion for summary judgment as to these disputed withholdings.

### B. Next Steps

When courts find that an agency has failed to justify its claimed FOIA exemptions, their typical practice is to deny both parties' motions for summary judgment without prejudice and instruct the agency to either produce the withheld portions or file supplemental declarations to fill the gaps identified by the Court. Kolbusz, 2021 WL 1845352, at *27 (collecting authorities). The Brady Center opposes giving the agency another bite at the apple, arguing that this case has been pending for long enough and that the Court should instead review the withholdings *in camera*. Brady Center Reply Br. at 24–25.

The Court will follow the ordinary course. "Congress left the matter of in camera inspection to the discretion of the district court[.]" Ray v. Turner, 587 F.2d 1187, 1195 (D.C. Cir. 1978). Here, the Court is not convinced that *in camera* review would advance the ball. The Court has little familiarity with how individuals might exploit the withheld material to illegally obtain guns—indeed, that is the whole problem with the FBI's summary-judgment briefing. *In camera* review without further explanation from the FBI of the risks that disclosure would create is therefore unlikely to fill in the gaps that the Court identified above.

Nor does the case's lengthy pendency necessitate *in camera* review. While this case may be four years old, the delays are partially attributable to the large volume of records involved—4,491 pages of them—and ordinary delays associated with the consultation process. The FBI also processes many requests that take up its limited resources. To be sure, the Court agrees that the public has an interest in learning about how the FBI operates NICS. But this case has already largely vindicated that interest. The parties dispute only a small fraction of the FBI's

production—154 out of 2,808 pages, or about 5%.  See Brady Center Resp. to FBI Statement of Undisputed Fact ¶ 6.  The Brady Center is free to use the remaining 95% to serve its public-education and advocacy missions, and the Brady Center gives the Court no reason to conclude that the disputed 5% will make or break its ability to pursue its goals.  And, as the Brady Center points out, the FBI's operation of the NICS has featured in other litigation and in media reporting.  It has also been the subject of multiple Department of Justice Inspector General reports.  See Office of the Inspector General, Audit of the Handling of Firearms Purchase Denials Through the National Instant Background Check System (Sept. 2016), available at https://oig.justice.gov/reports/2016/a1632.pdf; Brady Center MSJ Ex. 22 (2004 report).  So the public has other means of learning more about the NICS and its potential flaws.  While those alternative sources do not affect the Brady Center's entitlement to the records it seeks, they confirm that short-circuiting the agency-review process is unnecessary at this time.

  The Court will, however, order additional proceedings in this case on an expedited timeline with the admonition that this will be the FBI's final opportunity to justify its withholdings.  Within 30 days of the Court's entry of this opinion and order, the FBI shall either disclose the withheld portions of the SOPs or renew its motion for summary judgment.  If it renews its motion, it shall include supplemental declarations that explain, in greater detail, how disclosing the withheld material would create a risk of criminals circumventing the law.  To be clear, the FBI need not meet the "highly specific burden of showing how the law will be circumvented[.]"  Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009).  It need only "demonstrate logically how the release of the requested information might create a risk of circumvention[.]"  Id. (cleaned up).  So while the FBI does not have to spell out every possible pathway to criminality that disclosure might illuminate, it must give the Court more to work with

and explain the specific risks the FBI is concerned about and how disclosure would create those risks. The Court refers the FBI to its prior discussion of the shortcomings of its current declaration for guidance on what any supplemental declarations should include. Such material can, where appropriate, be filed under seal (subject to an appropriate protective order) or even *ex parte* if the material is particularly sensitive. See Arieff v. U.S. Dep't of the Navy, 712 F.2d 1462, 1470–71 (D.C. Cir. 1983) (discussing standard for filing sealed, *ex parte* declarations). But given the default presumption in favor of public access to court records, the Court urges the FBI to file its supplemental declaration publicly to the extent possible.

Finally, three additional housekeeping matters. First, the Brady Center contests the FBI's segregability analysis. Brady Center MSJ at 37. The Court will reserve ruling on that issue until after the FBI renews its motion, as the FBI may choose to alter its withholdings.

Second, the Brady Center does not contest the FBI's withholding of (1) privileged information under Exemption 5 and (2) FBI secure fax numbers, internal email addresses, and nonpublic phone numbers under Exemption 7(E). Brady Center MSJ at 3–4. The Court will therefore grant summary judgment to the FBI as to those withholdings.

Third, the Court will deny as moot the Brady Center's motion for expedition and motion for oral argument.

## IV. Conclusion

For these reasons, it is hereby

**ORDERED** that [51] Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART. It is further

**ORDERED** that [58] Plaintiff's Cross-Motion for Summary Judgment is DENIED WITHOUT PREJUDICE. It is further

**ORDERED** that [66] Plaintiff's Motion to Expedite is DENIED AS MOOT. It is further

**ORDERED** that [67] Plaintiff's Motion for Oral Argument is DENIED AS MOOT. It is further

**ORDERED** that Defendant shall either produce the withheld portions of the requested records or renew its motion for summary judgment by March 24, 2025. It is further

**ORDERED** that if Defendant chooses to renew its motion, it shall include a supplemental declaration describing in greater detail the risk of circumvention of the law. Plaintiff shall file a combined cross-motion for summary judgment and opposition to Defendant's motion by April 23, 2025. Defendant shall file a combined reply in support of its motion and opposition to Plaintiff's cross-motion by May 14, 2025. Plaintiff shall file a reply in support of its cross-motion by May 28, 2025.

**SO ORDERED.**

CHRISTOPHER R. COOPER
United States District Judge

Date: February 20, 2025